662 F.2d 853
 213 U.S.App.D.C. 297
 John W. McGINNESS, Brotherhood of Locomotive Engineers, and
Railway Labor Executives' Association, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 No. 79-2457.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 30, 1981.
Decided Aug. 17, 1981.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Gordon P. MacDougall and John O'B. Clarke, Washington, D. C., with whom Harold A. Ross, Cleveland, Ohio, and William G. Mahoney, Washington, D. C., were on the brief, for petitioners.
 Evelyn G. Kitay, Atty., I.C.C., Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C., Robert B. Nicholson and Bruce E. Fein, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Frederick W. Read, III, Atty., I.C.C., Washington, D. C., entered an appearance for respondents.
 Before MacKINNON, WILKEY and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge GINSBURG.
 Opinion concurring in part and dissenting in part filed by Circuit Judge MacKINNON.
 GINSBURG, Circuit Judge:
 
 
 1
 This is a petition to review a rulemaking decision of the Interstate Commerce Commission, Ex Parte No. 361, Exemption of Certain Designated Operators from Section 11343, 361 I.C.C. 379 (1979). The Commission's decision exempts companies operating exclusively as "designated operators" from the requirements of 49 U.S.C. §§ 11343 and 11347 (Supp. III 1979) (formerly section 5(2) of the Interstate Commerce Act) and 49 U.S.C. § 11322(a) (Supp. III 1979) (formerly section 20a(12) of the Act). Authority to issue the exemption rests on section 207 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), 49 U.S.C. § 10505 (Supp. III 1979) (amended 1980). As originally enacted,[1] the exemption authorization read:
 
 
 2
 Whenever the Commission determines, upon petition by the Secretary or an interested party or upon its own initiative, in matters relating to a common carrier by railroad subject to this part, after notice and reasonable opportunity for a hearing, that the application of the provisions of this part (i) to any person or class of persons, or (ii) to any services or transactions by reason of the limited scope of such services or transactions, is not necessary to effectuate the national transportation policy declared in this Act, would be an undue burden on such person or class of persons or on interstate and foreign commerce, and would serve little or no useful public purpose, it shall, by order, exempt such persons, class of persons, services, or transactions from such provisions to the extent and for such period of time as may be specified in such order. The Commission may, by order, revoke any such exemption whenever it finds, after notice and reasonable opportunity for a hearing, that the application of the provisions of this part to the exempted person, class of persons, services, or transactions, to the extent specified in such order, is necessary to effectuate the national transportation policy declared in this Act and to achieve effective regulation by the Commission, and would serve a useful public purpose.
 
 
 3
 "Designated operators" are rail carriers conducting operations pursuant to section 304(d) of the Regional Rail Reorganization Act of 1973 (the "3-R Act"), 45 U.S.C. § 744(d) (1976);[2] they provide service over minor segments of track. The ICC's decision exempts these operators from provisions that (1) require Commission approval for mergers and similar transactions, 49 U.S.C. § 11343,[3] (2) require carriers to protect the interests of their employees when they enter into mergers and similar transactions, 49 U.S.C. § 11347, and (3) prohibit interlocking directorates among carriers without prior Commission approval, 49 U.S.C. § 11322(a).
 
 
 4
 John W. McGinness, acting on behalf of the Illinois Legislative Board of the United Transportation Union, submitted comments to the Commission in opposition to the proposed exemption. When the ICC published its decision, McGinness, the Railway Labor Executives' Association, and the Brotherhood of Locomotive Engineers unsuccessfully petitioned for reconsideration; thereafter, they petitioned this court for review.
 
 
 5
 Petitioners raise two issues. First, they contend that the 4-R Act authority to grant exemptions is confined to certain statutory sections governing rates and does not extend to any of the sections addressed in the ICC's designated operators exemption decision. Second, they urge that even if the 4-R Act's exemption authority encompasses the merger (49 U.S.C. § 11343) and interlocking directorate (49 U.S.C. § 11322(a)) provisions, the ICC may not exempt any carrier, including designated operators, from the statutory labor protection requirement (49 U.S.C. § 11347). While we find petitioner's first contention insubstantial, we hold that the Commission lacks authority to relieve any carrier, even a designated operator, of the obligations imposed by 49 U.S.C. § 11347 to protect the interests of employees. Accordingly, we remand this case to the Commission for modification of its exemption decision, so that designated operators will not be released from the labor protection requirement.
 
 I.
 
 6
 Petitioners, in support of their contention that the 4-R Act's exemption authority applies only to certain railroad rate adjustments,[4] point out that the exemption provision, when enacted in 1976, appeared in a title captioned "Railroad Rates." This argument is unpersuasive. Rather than creating an entirely new statutory scheme, the 4-R Act worked within the framework of the existing Interstate Commerce Act. The intended placement of the exemption provision in the Interstate Commerce Act, therefore, is a more reliable indication of the congressional design than the location of the provision in the amending public law. The exemption provision was an amendment to § 12 of the Interstate Commerce Act, a section headlined "Authority and duties of Commission." Nothing in § 12's caption suggests confinement of the ICC's exemption authority to rate matters.
 
 
 7
 Moreover, in plain language, the exemption provision empowers the Commission to grant exemptions from "the application of this part." (Emphasis added.) The word "part" evidently refers to part I of the Interstate Commerce Act, the part of that Act in which the exemption provision was to be inserted. (The 4-R Act was organized by sections and titles, not by parts.) The second conference report on the 4-R Act confirms this view. It states that the House version of the provision-the version the conferees adopted-permits the ICC "to grant exemptions from Part I of the Interstate Commerce Act." H.R.Rep.No.781, 94th Cong., 2d Sess. 152-53 (1976). Part I of the Interstate Commerce Act was not confined to rates; it contained most of the provisions relating to railroad regulation, including the provisions at issue in this case. See 49 U.S.C. §§ 1-27 (1976).
 
 
 8
 Furthermore, the 4-R Act legislative history is consistent with a straightforward reading of the language of the exemption provision. The House Report, for example, states that "(t)he Committee has given the Commission (the exemption) power to study and review those areas of its regulation so as to eliminate from regulation those areas where regulation is not required." H.R.Rep.No.725, 94th Cong., 1st Sess. 75 (1975) (emphasis added). Similarly, the Senate Report declared that the exemption provision "would grant the Commission authority ... to exempt regulated carrier services from all or part of the regulations provided under the Act." S.Rep.No.499, 94th Cong., 1st Sess. 53 (1975) (emphasis added). Use of the general terms "regulation" and "areas" is hardly indicative of an intent to limit exemption authority to railroad rate deregulation.
 
 
 9
 Petitioners urge that the Secretary of Transportation sought an exemption provision so that the Commission could try out deregulation for railroads of "certain commodities not regulated for trucks and barges." Railroad Revitalization: Hearings on H.R.6351 & H.R.7681 before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 1st Sess. 153, 191 (1975). The House Report cites the Secretary's rate-related concern as one, but not the exclusive, reason for the exemption provision: "The provision is also addressed to the present inequity of the Interstate Commerce Act which regulates certain commodities for the railroad, but exempts them from other modes." H.R.Rep.No.94-725, at 75 (emphasis added).[5]
 
 
 10
 Finally, we note that when Congress reorganized the Interstate Commerce Act in 1978, it placed the exemption provision in a chapter titled "Jurisdiction." While petitioners correctly point out that the reorganizing statute specifically provided both that the reorganization effected no substantive change in the law and that inferences of legislative intent should not be drawn from the new location or caption of a provision,[6] Congress' treatment of the exemption provision in 1978 fully accords with the original language and legislative history of the provision. Furthermore, in 1980 Congress considerably revised the exemption provision. Staggers Rail Act of 1980, Pub.L.No.96-448, § 213, 94 Stat. 1895, 1912-13.[7] Despite several ICC proceedings such as this one applying the exemption provision to non-rate matters,[8] Congress did not include in the revision any stipulation indicating that it intended to restrict the Commission's exemption authority to railroad rates. In light of all these considerations, we conclude that the Commission's reading of the exemption to extend beyond rail rate matters is reasonable and in accordance with law.
 
 
 11
 Two further challenges to the legality and reasonableness of the Commission's designated operators exemption decision may be quickly dispatched. First, petitioners complain that the ICC should have included a termination date in its exemption order. While the statute provides that the Commission may set an expiration date in an exemption order, it does not mandate such a stipulation.[9] Second, petitioners argue that under the 4-R Act exemption provision,[10] the ICC may exempt only "services or transactions" because of their "limited scope" but, in this case, the Commission issued the exemption because it found the class of carriers (designated operators), not the services or transactions, limited in scope. As the Commission notes, the "limited scope" language in the 4-R Act exemption provision is directed to Commission proposals to exempt a "service or transaction," not to Commission exemptions of a "person or class of persons" from regulation. At any rate, transactions among designated operators are necessarily "limited in scope," for those operators comprise a slender part of the national rail system. At the time of the Commission's exemption decision, there were 26 designated operators, providing service over only 1,341.2 miles of track in 11 states (J.A. 28, 37-50).[11]
 
 II.
 
 12
 Petitioners maintain that the ICC unlawfully exempted designated operators from the section 11347 labor protection requirement applicable when a rail carrier merges or otherwise coordinates or consolidates its activities in a manner identified in 49 U.S.C. § 11343. Section 11347 requires rail carriers involved in a section 11343 transaction to provide a fair arrangement protective of the interests of employees.[12] The ICC counters that Congress intended, when it passed the 3-R Act in 1973,[13] "to encourage continued rail service over lines which would otherwise be discontinued or abandoned."[14] Imposition of labor protection obligations in section 11343 transactions among designated operators, the ICC argues, would conflict with this broad legislative objective; it would render more costly, and therefore deter, efforts by designated operators to improve their efficiency through coordination and consolidation.
 
 
 13
 After the ICC's decision, and the initial briefing in this court, Congress enacted the Staggers Rail Act of 1980.[15] That Act, we conclude, is dispositive of the labor protection controversy. The Staggers Act revised 49 U.S.C. § 10505, the provision authorizing the ICC to grant exemptions from regulation. Section 10505(g), a subsection added by the 1980 Act, states explicitly that "(t)he Commission may not exercise its authority (to grant exemptions) ... to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle." The Conference Report on the Staggers Act states a general expectation that exemption orders issued prior to the effective date of the Act (October 1, 1980) would remain in full force and effect, unless revoked by the Commission. However, the conferees excepted, inter alia, the section 10505(g) prohibition against relieving a carrier of its obligation to protect the interests of employees. The Report indicates that existing as well as future exemptions would be subject to the section 10505(g) prohibition. Specifically, the conferees stated:
 
 
 14
 (W)e also expect that except to the extent necessary to comply with subsections (e) and (g) of section 10505 ((g) bars exemption from the labor protection requirement) ..., an exemption order issued by the Commission prior to the effective date of the Staggers Rail Act of 1980 shall remain in full force and effect unless revoked pursuant to subsection (d) of section 10505 of title 49 U.S.C. as amended.
 
 
 15
 H.R.Rep.No.1430, 96th Cong., 2d Sess. 105 (1980) (emphasis added).
 
 
 16
 We need not dwell on the ICC's argument that, despite the Conference Report, no provision newly introduced in the Staggers Act is retroactive. Nor need we address petitioners' argument that the Report confirms a constant congressional intent that labor protection must attend all section 11343 transactions. The ICC concedes that its rulemaking decision has future effect;[16] it is designed for application to post-October 1, 1980, merger transactions between designated operators. Thus there is plainly no warrant in this case for departing from the well-established principle that "courts are obligated to apply law (otherwise valid) as they find it at the time of final judgment, including, when a case is on review, the time of the appellate judgment." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 316 n.4 (2d ed. 1973); see Bradley v. School Board, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("(A) court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary."); Thorpe v. Housing Authority, 393 U.S. 268, 281-82, 89 S.Ct. 518, 525-526, 21 L.Ed.2d 474 (1969); Eikenberry v. Callahan, 653 F.2d 632 (D.C.Cir.1981); Coca-Cola Co. v. FTC, 642 F.2d 1387, at 1389-1390 (D.C.Cir.1981) (court set aside an FTC order that was inconsistent with a federal statute enacted during pendency of the appeal).
 
 
 17
 Although the ICC acknowledges that the decision under review has prospective thrust, it asks us not to apply the Staggers Act at this time because petitioners, in a new petition, can invite the Commission to reconsider the matter in light of that Act and can return to this court after Commission reconsideration. We do not agree with the ICC that the proposed course would serve the interests of "judicial economy and the sound administration of justice."[17] We see only delay, unnecessary expense, and inefficiency in the suggestion that we remit petitioners to the Commission to start over with a fresh petition. The ICC's position in this regard is all the more puzzling because it has presented to this court a decided view: the Commission asserts that the Staggers Act effects no relevant change in the law. Now, as before, the ICC maintains, it has authority to exempt designated operators from the labor protection obligation.[18]
 
 
 18
 On that dispositive question, whether the Staggers Act affords the Commission discretion to allow designated operators to merge free from section 11347 labor protection strictures, the ICC refers to "the unique characteristics of (such) operators." They "are not the functional equivalent of rail common carriers," the Commission underscores.[19] But in the very decision on review, the ICC quoted from its 1976 notice, in implementation of the 3-R Act:[20]
 
 
 19
 Although the Designated Operator will not be required to seek and obtain authority from the Commission pursuant to section 1a and 1(18) of the (Interstate Commerce Act) for either commencement or termination of operations, the Designated Operator will be subject to all other provisions of the Act ... as a common carrier by railroad. (Emphasis added.)
 
 
 20
 In 1976, evidently, the Commission recognized that designated operators were "rail carriers"[21] and, except with respect to commencement and termination, were subject to generally applicable rail carrier regulation. Nor has the Commission retracted that published position. The Commission points to no statutory text that gives it leeway to treat designated operators as anything other than a rail carrier for the purpose at hand.
 
 
 21
 It is not within the ICC's province, nor is it within this court's, to decide whether it is wise policy to saddle designated operators with the section 11347 labor protection requirement. We cannot indulge the Commission's plea that we read exceptions into unqualified statutory texts and thus presume to decide how Congress would respond if the exceptions were put to a vote. To summarize what Congress did instruct: (1) the Commission "shall require" a rail carrier involved in a section 11343 transaction "to provide a fair arrangement" to protect the interests of rail employees who may be affected, 49 U.S.C. § 11347; (2) the Commission may not relieve a carrier of the section 11347 labor protection requirement, 49 U.S.C. § 10505(g).[22] Since section 11347, as Congress wrote it, does not afford the Commission discretion to narrow the term "rail carrier" by nonstatutory definition,[23] and section 10505(g), as Congress wrote it, affords the Commission no leeway to create exceptions,[24] we must reject the ICC's endeavor to release designated operators from the employee protection burden.[25]
 
 
 
 For the reasons stated above we remand the order under review for modification to assure that, in accordance with 49 U.S.C. § 10505(g), designated operators are not relieved of the obligation imposed by 49 U.S.C. § 11347 to protect the interest of employees. In all other respects, the Commission's order is affirmed.
 Affirmed in part and remanded for modification consistent with this opinion.
 MacKINNON, Circuit Judge, concurring in part and dissenting in part:
 I concur in the majority opinion insofar as it holds that the Interstate Commerce Commission's exemption authority under 49 U.S.C. § 10505 is not limited to rate matters and that the challenged exemption order did not violate the "limited scope" requirement and was not invalid because it lacked a termination date.
 My point of departure with the majority concerns its holding that designated operators must comply with the employee protective provisions of section 11347. The Commission has consistently taken the position that Congress did not intend the labor protective provisions to apply to designated operators. Thus, when, in the course of exempting designated operators from the requirement of obtaining Commission approval for mergers and similar transactions, the Commission stated that the labor protective provisions would not apply, the Commission was not exercising its exemption authority. It was merely construing the statute. Hence, the Staggers Act provision stating that "(t)he Commission may not exercise its authority (to grant exemptions) ... to relieve a carrier of its obligations to protect the interests of employees as required by this subtitle " has no effect here, for the Commission was not exercising its exemption authority and designated operators are not required by section 11347 to protect the interests of employees in mergers and similar transactions.
 Designated operators provide rail service pursuant to section 304(d) of the Regional Rail Reorganization Act of 1973 (3R Act), 45 U.S.C. § 744. Under the 3R Act the United States Railway Association promulgated a final system plan that determined which of the lines of the numerous Northeast railroads in reorganization would be transferred to the Consolidated Rail Corporation (Conrail). Those lines not included in the final system plan were subject to automatic discontinuance. Service over these lines, however, could continue if a subsidizer guaranteed payment to a designated operator of the difference between the revenues attributable to its rail service operations and its avoidable costs, together with a reasonable management fee. In re Exemption of Certain Designated Operators from Section 11343, 361 I.C.C. 379, 380, 383 (1979).
 The Commission has treated designated operators differently from other rail carriers in a number of respects. Rather than require them to obtain a certificate of public convenience and necessity pursuant to 49 U.S.C. § 10101, the Commission has set up an independent procedure whereby designated operators need only obtain a "Certificate of Designated Operator" before commencing service. 361 I.C.C. at 380. Likewise, the Commission has not required designated operators who wish to abandon or discontinue service to obtain prior Commission approval under 49 U.S.C. § 10903 before terminating operations. When a rail carrier that must comply with section 10903 obtains Commission approval to abandon or discontinue service it receives a certificate describing the discontinuance that must "contain provisions to protect the interests of employees."[1] Thus, when a designated operator abandons or discontinues service, it is not required to comply with the employee protective provisions.
 The Commission supported its position that labor protective provisions would not apply to mergers between designated operators by noting that although designated operators may include labor costs as part of their avoidable costs, labor protection cannot be so included. 361 I.C.C. at 383. The Commission thus concluded that Congress did not intend the labor protective provisions to apply
 in section 11343 transactions between companies operating exclusively as Designated Operators .... (T)he intent of the 3R Act is to encourage continued rail service over lines which would otherwise be discontinued or abandoned; imposition of labor protection in section 11343 transactions might encourage these Designated Operators and their corresponding subsidizers to discontinue inefficient and costly Designated Operator operations rather than to use section 11343 transactions to achieve a more efficient and less costly continued operation.[2]
 Since the Commission's action with respect to labor protection was not an exercise of its exemption authority, but instead an interpretation of the Interstate Commerce Act, it is entitled to "great weight and respect."[3] In my opinion the Commission has properly interpreted the statute that it is charged to implement and enforce. I accordingly dissent from the majority opinion insofar as it holds that the Commission improperly ruled that labor protection provisions do not apply to mergers and similar transactions between companies operating exclusively as designated operators.
 
 
 [1]
 4-R Act Pub.L.No.94-210, § 207, 90 Stat. 31, 42 (1976). Section 207 was originally codified at 49 U.S.C. § 12(1)(b) (1976). In 1978 Congress revised and reenacted the Interstate Commerce Act as subtitle IV of title 49 of the United States Code. The exemption provision quoted in the text was then codified, in somewhat different form, at 49 U.S.C. § 10505. Congress specifically provided that the 1978 reenactment may not be construed to effect any substantive change in the law and that inferences of legislative intent should not be drawn from the position of a provision in the reenacted statute or from captions or catchlines in the new statute. Act of Oct. 17, 1978, Pub.L.No.95-473, § 3(a), (e), 92 Stat. 1337, 1466. We therefore set out the language of the exemption prior to reenactment. In 1980, Congress amended the exemption provision to alter the findings necessary to support exemption orders and, in a new subsection relevant to one of the issues in this case, provided that the Commission could not relieve a carrier of the obligation to protect the interests of employees affected by mergers and similar transactions. Staggers Rail Act of 1980, Pub.L.No.96-448, § 213, 94 Stat. 1895, 1912
 
 
 [2]
 The 3-R Act, responding to railroad bankruptcies in the northeast and midwest, established the Consolidated Rail Corporation to operate rail lines considered essential to the regional and national interest. Other lines could be abandoned unless "a financially responsible person" offered to subsidize them. 45 U.S.C. § 744(c) (1976). Companies operating these nonessential, subsidized lines are called "designated operators."
 
 
 [3]
 The Commission's decision clarifies that the exemption applies only to transactions between or among carriers operating exclusively as designated operators; the exemption does not reach transactions in which at least one party is another type of carrier. 361 I.C.C. at 381-82
 
 
 [4]
 Arguments similar to those treated under this heading were presented in Illinois Commerce Commission v. United States, No. 80-1484, heard in tandem with this petition. Because of the substantial overlap in issues raised by the petitions in the two cases, we need not decide Illinois Commerce Commission by full opinion. Instead, we affirm the ICC's decision in that case by a judgment accompanied by a brief memorandum issued together with this opinion. See D.C.Cir.R. 13(c)
 
 
 [5]
 We cannot credit petitioners' contention (Reply Brief at 5) that "the I.C.C.'s explanation of the legislative intent is markedly different today from that which it espoused to Congress." On the contrary, the very material petitioners reproduce, a September 12, 1975, communication from the ICC to principal committee chairmen, states that the exemption the Commission proposed "would allow (it) to exempt certain segments of surface transportation from all or part of the regulatory requirements of the Interstate Commerce Act. Reply Brief at 8a (emphasis added). The ICC further noted that without an exemption provision, it was "forced to exact compliance with franchise, rate and other regulatory provisions from all carriers." Id. (emphasis added)
 
 
 [6]
 See note 1 supra
 
 
 [7]
 As revised in 1980, the first section of the exemption provision reads:
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle-
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 Cf. note 1 and accompanying text supra (setting out the exemption as originally framed).
 
 
 [8]
 E.g., Burlington Northern, Inc., Finance Docket No. 28972F, 44 Fed.Reg. 49112 (Aug. 21, 1979) (exempting merger of two railroad companies from requirements of 49 U.S.C. §§ 11343-11347); Canadian Pacific Ltd. & Canellus Inc., Finance Docket No. 29010F, 44 Fed.Reg. 45012 (July 31, 1979) (exempting acquisition of railroad from requirements of 49 U.S.C. §§ 11343-11347); Northmont Industries, Inc., Finance Docket No. 29149, 45 Fed.Reg. 13545 (Feb. 29, 1980) (exempting lease of railroad from 49 U.S.C. §§ 11343-11347)
 
 
 [9]
 As enacted in 1976, the 4-R Act authorized the Commission to grant exemptions "to the extent and for such period of time as may be specified in (the) order." (Emphasis added.) See text following note 1 supra. As rephrased in 1978, the provision stated:
 The Commission may specify the period of time during which (an) exemption is effective.
 49 U.S.C. § 10505(b) (Supp. III 1979) (amended 1980) (emphasis added). The 1980 revision is similarly worded:
 The Commission may specify the period of time during which an exemption granted under this section is effective.
 Staggers Act of 1980, Pub.L.No.96-448, § 213, 94 Stat. 1895, 1912-13 (to be codified at 49 U.S.C. § 10505(c)) (emphasis added). While the 1978 alteration was not intended to work any substantive change and the 1980 revision, in this particular, does not have a retrospective thrust, the clearer language used in 1978 and 1980 may serve to resolve any ambiguity in the 1976 version. Cf. Purolator Courier Corp. v. ICC, 598 F.2d 225, 227 n.5 (D.C.Cir.1979).
 Nor is this interpretation inconsistent with Air Line Pilots Association, Int'l v. CAB, 458 F.2d 846 (D.C.Cir.), cert. denied, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1972). There, this court construed the CAB's exemption authority (expressed in terms similar to the 1976 version of the ICC's exemption power) to incorporate a "temporal limitation" on exemptions. As the ICC points out, however, Air Line Pilots did not require the CAB to include a termination date in any exemption order. Rather, the court held that when circumstances change, an agency may have to reconsider a previously granted exemption. The ICC is similarly charged with responsibility for reconsideration and revocation of exemptions when national transportation policy so indicates. See 4-R Act, Pub.L.No. 94-210, § 207, 90 Stat. 31, 42 (1976), set out at text following note 1 supra; Staggers Act of 1980, Pub.L.No.96-448, § 213, 94 Stat. 1895, 1912-13 (to be codified at 49 U.S.C. § 10505(d)).
 
 
 [10]
 Set out at text following note 1 supra
 
 
 [11]
 As noted earlier, the exemption is limited to transactions in which each party operates exclusively as a designated operator. 361 I.C.C. at 381-82
 
 
 [12]
 Section 11347, titled "Employee protective arrangements in transactions involving rail carriers," reads:
 When a rail carrier is involved in a (section 11343) transaction ..., the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).
 
 
 [13]
 See note 2 supra
 
 
 [14]
 361 I.C.C. at 383; see Supplemental Memorandum of Interstate Commerce Commission at 8
 
 
 [15]
 See note 7 and accompanying text supra
 
 
 [16]
 Supplemental Memorandum of Interstate Commerce Commission at 2, 5-6
 
 
 [17]
 Id. at 6
 
 
 [18]
 Id. at 6-9
 
 
 [19]
 Id. at 6-7
 
 
 [20]
 Notice, Continuation of Rail Service Under Subsidy by Designated Operator, 41 Fed.Reg. 10526 (Mar. 11, 1976), quoted in 361 I.C.C. at 381. The 3-R Act specially provides for abandonment or continuation of designated operator routes. 45 U.S.C. § 744 (1976 & Supp. III 1979). The Commission, therefore, established special filing procedures responsive to that section, instead of requiring designated operators to proceed under the more general provisions of the Interstate Commerce Act
 
 
 [21]
 The term "rail carrier" is defined in 49 U.S.C. § 10102(17) (Supp. III 1979) as "a person providing railroad transportation for compensation."
 
 
 [22]
 In Illinois Commerce Commission v. United States, supra note 4, the exemption order was conditioned on the rail carrier's acceptance of employee protections outlined in New York Dock Railway, 360 I.C.C. 60, aff'd, 609 F.2d 83 (2d Cir. 1979). The Second Circuit described the New York Dock conditions as "significantly more protective of the interests of railway labor than any previously imposed single set of employee protective conditions." 609 F.2d at 91. As our affirmance in Illinois Commerce Commission indicates, we agree with the ICC that the exemption issued in that case "complies with the requirement of the exemption provision (49 U.S.C. § 10505) as amended by the Staggers Act to prohibit exemptions which relieve a carrier of labor protection obligations required by provisions of the Act governing rail carriers." Supplemental Memorandum of Interstate Commerce Commission at 1 n.2
 
 
 [23]
 While the ICC argues in this case that designated operators "are more like contract carriers than rail carriers," Supplemental Memorandum of Interstate Commerce Commission at 7, the Commission does not deny that designated operators are embraced by the statutory definition of the term "rail carrier." See note 22 supra. The statute defines "contract carrier" to mean "a motor contract carrier and a water contract carrier." 49 U.S.C. § 10101(5). Of course, if designated operators were something other than rail carriers, they would not be subject to the requirements of 49 U.S.C. §§ 11343-11347 in the first place, and there would be no need to exempt them from any of those requirements
 
 
 [24]
 We therefore cannot agree with the ICC that since Commission approval is not required when a designated operator abandons operations, "it follows that the merger transactions should not be treated differently." Supplemental Memorandum of Interstate Commerce Commission at 8. In its own published notice, see text following note 21 supra, the ICC distinguished the entry and exit settings from all others
 
 
 [25]
 The ICC cites Tennessee Central Ry. Abandonment, 334 I.C.C. 235, 246 (1969), and Okmulgee Northern Ry. Abandonment, 320 I.C.C. 637, 641 (1964), cases in which it "found that the need for rail service outweighs the interest of former employees especially where the continuation of operations might provide employment opportunities that otherwise might not exist." Supplemental Memorandum of Interstate Commerce Commission at 9 n.5. The Commission neglects to mention, however, that those decisions issued at a time when, in some types of cases, the Interstate Commerce Act did not mandate the Commission to impose employee protections. Since the Commission had discretion to decide whether to impose those protections, it sometimes decided not to do so when the need for rail service was strong and the imposition of employee protections would have discouraged the railroad from undertaking the service. But decisions relating to the exercise of discretion, when the Act permitted the Commission to use discretion, are not instructive here, where Congress has mandated employee protection and has explicitly withheld from the Commission authority to exempt any rail carrier from according that protection. However "reasonable" the Commission's action, we cannot defer to a disposition unauthorized by statute. See e.g., Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969); Austasia Intermodal Lines, Ltd. v. FMC, 580 F.2d 642, 644 (D.C.Cir.1978)
 
 
 [1]
 49 U.S.C. § 10903(b)(2). This section requires that such "provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 565(b) of title 45." Id
 
 
 [2]
 361 I.C.C. at 383. The Commission stated that
 Companies operating exclusively as Designated Operators are generally small financially, and have no major impact, singly or in combination, on the competitive situation of other common carriers by railroad.
 Id. at 382.
 
 
 [3]
 Munitions Carriers Conference, Inc. v. American Farm Lines, 415 F.2d 747, 749 (10th Cir. 1969). Accord, Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 647 n.26, 98 S.Ct. 2053, 2063, 56 L.Ed.2d 591 (1978) (ICC regulation that was a contemporaneous construction of the Interstate Commerce Act by the people "charged with the responsibility of setting its ... machinery in motion ... is presumptively correct"); Baltimore & Ohio Chicago Terminal R. R. v. United States, 583 F.2d 678, 683 (3d Cir. 1978) ("(i)n analyzing a question of statutory construction, ... to sustain the ICC it is necessary only that we find its interpretation to be a reasonable one"), cert. denied, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979)