697 F.2d 326
 112 L.R.R.M. (BNA) 2015, 225 U.S.App.D.C. 84
 Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
State of Michigan, Department of Transportation, State of
Wisconsin, Department of Transportation, State of South
Dakota, Railway Labor Executives' Association, Iowa
Department of Transportation, Commissioner of Transportation
of the State of New York, Intervenors.
 No. 81-2009.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 14, 1982.
Decided Dec. 14, 1982.
 
 Gordon P. MacDougall, Washington, D.C., for petitioner.
 
 
 1
 John O'B. Clarke, Jr., Washington, D.C., for intervenor Railway Labor Executives' Ass'n.
 
 
 2
 Evelyn G. Kitay, Atty., I.C.C., with whom Robert S. Burk, Acting Gen. Counsel, Kathleen M. Dollar, Associate Gen. Counsel, I.C.C., and John J. Powers, III, and Kenneth P. Kolson, Attys., U.S. Dept. of Justice, Washington, D.C., were on brief, for respondents. Daniel B. Harrell, Atty., I.C.C., Washington, D.C., also entered an appearance for respondent ICC.
 
 
 3
 Anthony J. Ciccone, Jr., Washington, D.C., with whom Jacob P. Billig, Washington, D.C., was on brief, for intervenor State of South Dakota.
 
 
 4
 Dennis J. Downing, Des Moines, Iowa, was on brief for intervenor Iowa Dept. of Transp.
 
 
 5
 Fritz R. Kahn and Ellen A. Efros, Washington, D.C., were on brief, for intervenor State of Michigan, Dept. of Transp.
 
 
 6
 Bronson C. La Follette, Atty. Gen., and Charles D. Hoornstra, Asst. Atty. Gen., Madison, Wis., entered appearances for intervenor State of Wisconsin, Dept. of Transp.
 
 
 7
 John C. McTiernan, Albany, N.Y., entered an appearance for intervenor Com'r of Transp. of the State of New York.
 
 
 8
 Before TAMM and MacKINNON, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 
 
 9
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 10
 This case presents the question of the extent of the Interstate Commerce Commission's (Commission) authority to exempt persons from provisions of the Interstate Commerce Act pursuant to its authority under 49 U.S.C. Sec. 10505(a) (Supp. IV 1980). In rulemaking proceedings the Commission created a modified certificate of convenience and necessity allowing states and their contract operators providing rail service under state-organized rail programs to start and terminate service without prior approval from the Commission. As part of the modified certificate program, states or their contract operators were exempted from the labor protection provisions of 49 U.S.C. Secs. 10903(b)(2) and 11347 (Supp. IV 1980). After reviewing Congress's grant of discretion to the Commission to impose labor protection on the rail industry and reviewing the concerns expressed by Congress for state rail programs in the passage of the Staggers Rail Act of 1980 (Staggers Act), Pub.L. No. 96-448, 94 Stat. 1895, we find that the Commission had the authority under 49 U.S.C. Sec. 10505(a) to create the modified certificate program. Accordingly, we affirm the Commission's program in its entirety.
 
 I. BACKGROUND
 
 11
 The declining fortunes of the nation's rail industry came to a crucial focus in the 1970's, when the collapse of several major carriers necessitated a substantial federal effort to ensure the continuation of vital service and to restore the rail industry to a level of financial health sufficient to meet future needs for investment capital.[1] The first significant step toward these ends was the Regional Rail Reorganization Act of 1973 (3-R Act), Pub.L. No. 93-236, 87 Stat. 985, which combined the bankrupt operations of six eastern and midwestern railroads into the federally owned corporation known as the Consolidated Rail Corporation, or Conrail.[2] The 3-R Act also implemented a federal and state planning process to establish priorities for rail planning and financial assistance and to identify which rail lines faced abandonment, as well as encouraging states to become involved in the preservation of local rail service.[3] Another cornerstone of federal policy was the liberalization of the regulatory framework first laid over the rail industry with the passage of the Interstate Commerce Act (ICA) in 1887.[4] The loosening of this regulatory framework was accomplished primarily in the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act)[5] and in the Staggers Act. An improved regulatory climate, it was hoped, would increase the rail industry's productivity and enhance financial returns sufficiently to encourage an infusion of private capital into the industry.[6]
 
 
 12
 Indicative of the financial plight of the rail industry was the increasing number of branch lines being abandoned by rail carriers.[7] As railroads sought to restructure and consolidate their limited financial resources on lines having the best financial potential, communities along branch lines in danger of abandonment looked for ways to preserve and improve existing rail service.[8] Congress's response to the problems presented by branch line abandonments was two-fold. On the one hand, Congress recognized that some rationalization of the nation's network of rail lines was warranted, since economic changes had made many lines duplicative or unprofitable.[9] On the other hand, Congress recognized that affected communities still desired to preserve service to protect existing shippers and employment; Congress and some community leaders also saw rail service as a potential tool for economic development.[10] To meet carrier needs, Congress in the 4-R and Staggers Acts made significant changes to the procedures by which a carrier was able to abandon service along a rail line. The timetable the Commission had to follow in approving or rejecting an application to abandon service was accelerated, and the process by which an abandonment application was handled was improved.[11] Community interests were served in two major ways. The abandonment process was amended to allow the Commission to compel the transfer of a line being abandoned to an approved purchaser for a legally established minimum price.[12] In addition, Congress expanded existing programs to assist the states in acquiring and rebuilding rail lines and in providing operating subsidies to continue service.[13]
 
 
 13
 This congressional policy of placing the states at the forefront of the federal effort to preserve local rail service has met with at least some success. Several states have developed programs for acquiring lines or subsidizing rail service to selected communities.[14] South Dakota, for example, acquired most of the lines of the Chicago, Milwaukee, St. Paul & Pacific R.R. Co. in that state, contracting with an existing carrier to operate trains along the state-owned lines.[15] Other midwestern states like Wisconsin and Iowa responded to the loss of service to rural communities by establishing programs that provided funds to rehabilitate track roadbed and structures and that arranged the continuation of service through existing rail carriers or newly formed short-line railroads.[16]
 
 II. COMMISSION PROCEEDINGS
 
 14
 The entry of an increasing number of states into the rail industry, though encouraged and financially assisted by federal legislation, raised questions concerning the states' obligations under the ICA and appurtenant Commission regulations governing the rail industry. Initially, Commission staff stated in an advisory opinion that, while acquisition of rail lines already abandoned or in the process of abandonment was outside the regulatory jurisdiction of the Commission, subsequent operation of those rail lines by a state or a contract operator would require that the state and its operator obtain a common carrier certificate from the Commission.[17]
 
 
 15
 The Staff Advisory Opinion, although not binding on the Commission, led several states to petition the Commission for a clarification of their status as common carriers and for a waiver of their common carrier obligations under the ICA if the Commission found that the states were subject to those requirements as a result of their state rail programs.[18] In their petition the states presented the Commission with three variations of state involvement in rail services: government acquisition or lease of a rail line and subsidized operation by a carrier, government acquisition or lease of a rail line and operation by a non-subsidized carrier, and government acquisition and operation of a rail line.[19] The states argued that the administrative burdens of common carrier status would have a "chilling effect" on their efforts to secure rail service on abandoned lines, since the obligations of common carrier status could impede long term efforts to maintain service on uneconomic lines and interfere with the planning, financing, and modification of state rail programs.[20] The states also argued that the short term nature of federal assistance for continuing local rail service militated against their involvement if full common carrier status ensued, since labor protective provisions and protracted abandonment proceedings could have created obligations on state authorities without the necessary federal or state appropriations to fulfill those obligations.[21] In addition, some state constitutions or statutes prevented the state or relevant agency from becoming a common carrier.[22]
 
 
 16
 The Commission acted on the states' request when it published a notice of proposed rules ("NPR") in 1980.[23] In the NPR, the Commission concluded that it lacked jurisdiction to regulate state acquisition of an abandoned rail line, since by the process of abandonment the line lost its status as rail property.[24] In the Commission's view, once operation of an abandoned rail line began, Commission jurisdiction would attach by reason of 49 U.S.C. Sec. 10901 (Supp. III 1979), which required Commission approval of the operation of a rail line in the form of a certificate of public convenience and necessity, which issued only after the Commission found that the present or future public convenience and necessity permit the operation of the line. The Commission also concluded that, regardless of whether the state operated the line directly or contracted for services, states would incur all the obligations of a common carrier once they began operations over abandoned rail lines.[25]
 
 
 17
 Having asserted jurisdiction over state rail activities, the Commission proposed to exempt states from the obligations of a common carrier under authority then granted the Commission in 49 U.S.C. Sec. 10505(a) (Supp. III 1979). In place of the traditional certificates of convenience and necessity, the Commission proposed that the operator obtain a special service certificate that permitted start-up simply upon filing a request and permitted termination of service simply upon sixty days' notice to the Commission. No hearings or prior approval were required of the Commission before service was initiated or terminated.
 
 
 18
 Several interested parties submitted comments to the Commission, with state governments generally supporting the NPR and labor and shipper organizations opposing the NPR. In the final rules and exemptions adopted by the Commission, certain modifications and clarifications were made to the exemptions and special service certificates proposed in the NPR.[26] In particular, a modified certificate of public convenience and necessity was substituted for the proposed special service certificate. To obtain a modified certificate for lines already abandoned or approved for abandonment, states or the operators of state-acquired lines must file a notice with the Commission containing information describing the operator's corporate organization, its finances, and the nature of services to be provided.[27] Rail operations can begin immediately with the filing of the required notice; Commission review follows the filing, and, if the filing is complete, a modified certificate of public convenience and necessity is issued to the operator by the Commission. Unlike abandonment of a rail line operated by a traditional carrier holding a certificate of public convenience and necessity issued under 49 U.S.C. Sec. 10901, termination of service under a modified certificate can take place following only sixty days' notice to the Commission, the state, and affected shippers. The final regulations do not require the Commission to hold public hearings either to start or to terminate service, nor is any express provision made in the final regulations for labor protection, unlike that granted in abandonments effected under 49 U.S.C. Sec. 10903(b)(2) (Supp. IV 1980).
 
 
 19
 The Commission based its final rules on the authority granted it in 49 U.S.C. Sec. 10505(a), which empowers it to exempt any person from most provisions of subtitle IV of the ICA, which deals with rail regulation.[28] In meeting the requirement of section 10505 that exemptions be restricted to matters of limited scope not necessary to carry out national transportation policy, the Commission noted that the average abandoned line is short and that only a few of the lines abandoned are eventually acquired by states as part of their rail programs.[29] The Commission found that the exemption would assist the states in continuing rail service for this limited class of abandoned lines and would remove obstacles that might prevent state acquisition of abandoned rail lines.[30] To the comments of labor concerning the need for labor protection, the Commission responded that no change had taken place in the Commission policy of imposing labor protection on the carrier that initially abandoned the line acquired by the state.[31]
 
 
 20
 Three parties filed petitions for reconsideration of the Commission's decision. Minor modifications in the rules were made in light of these petitions for reconsideration, but the substance of the rules remained in effect.[32] Thereafter, petitioner Patrick Simmons[33] sought review of the Commission's action in this court, as permitted by 28 U.S.C. Secs. 2321, 2342 (1976 and Supp. IV 1980).
 
 III. ANALYSIS
 
 21
 A. The Commission's Authority to Issue a Partial Exemption
 
 
 22
 The central issue presented by petitioner's appeal of the Commission's rulemaking proceeding is the scope of the Commission's authority to exempt states and subunits of state governments from the full panoply of Commission regulations. Under the authority granted the Commission in section 10505(a), the Commission can exempt a person from the effect of most Commission regulations, provided it finds that the exemption is not necessary to further the goals of the national transportation policy and is of limited scope or not needed to protect shippers from an abuse of market power.[34] In addition, any exemption can be limited in duration and revoked in whole or in part if later found unnecessary.[35]
 
 
 23
 Petitioner argues that the Commission used an impermissible procedure to establish the modified certificate of public convenience and necessity. He argues that the statutory framework of section 10505 requires that the Commission first wholly exempt a party, after appropriate findings, and then make additional findings in a separate proceeding to revoke partially the previous exemption. We find this contention to be inconsistent with Congress's purpose in granting the Commission its exemptive authority and contrary to the intent of Congress in providing the Commission with this power.
 
 
 24
 The exemptive authority granted the Commission in section 10505(a) was first adopted in the 4-R Act.[36] The express purpose of Congress in enacting this section was to grant the Commission authority to review its regulations and withdraw any such regulations found to be unnecessary to effect the goals of national transportation policy or regulations that served little or no public purpose.[37] As noted in the conference report on the 4-R Act, the Commission would be able "to exempt any person or services or transportation performed under this Act from all or part of the regulations under the Interstate Commerce Act ...."[38]
 
 
 25
 In explaining the Commission's exemptive authority, Congress noted that this provision was to be "an important cornerstone"[39] of a new, flexible approach to regulating the rail industry, adding that the Commission can grant "partial and complete exemptions from remaining regulation."[40] Moreover, the very language of section 10505(a), as it existed in 1980[41] and as it exists today,[42] gives the Commission authority to limit an exemption to only part of existing regulations. The matters within the purview of section 10505 prior to the changes made by the Staggers Act were any regulation under the ICA. The Commission, further, has the power to limit the time an exemption is effective[43] and can revoke any part of an exemption after appropriate findings.[44] Since the Commission is empowered to revoke part of an exemption after appropriate findings, the Commission likewise is empowered to limit the scope of an exemption in the first instance. The requirement of section 10505(a) that before granting an exemption the Commission find that a provision of the ICA is not necessary to effect the policy goals expressed in the ICA[45] will ensure that congressional safeguards against unwarranted deregulation are observed. To impose a two-step process on the Commission, in which the Commission would first have to grant a total exemption and then revoke that exemption in part, would be to elevate form completely over substance. Given the clear congressional intent to grant the Commission regulatory flexibility, we hold that the Commission has authority under section 10505 to order a partial exemption from Commission regulations and to issue modified certificates of public convenience and necessity without first exempting the state programs entirely and then revoking only part of the exemption just granted.
 
 
 26
 B. The Commission's Authority to Exempt States from Labor Protection Provisions of the ICA
 
 
 27
 At the heart of petitioner's appeal is his contention that the Commission lacks the authority to exempt state-supported rail programs from statutorily imposed provisions protecting certain workers when rail services are terminated.[46] According to petitioner, Congress precluded the Commission from granting an exemption from labor protection requirements when it amended section 10505 in the Staggers Act by adding subsection (g). Subsection (g) reads in pertinent part: "The Commission may not exercise its authority under this section ... (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle."[47] In petitioner's view, section 10505(g)(2) is retroactive in effect, circumscribing not only the Commission's future exemptive authority, but also requiring the Commission to amend prior exemptions it had granted, such as the modified certificate program, if in conflict with section 10505(g)(2). As authority for this interpretation petitioner cites a recent decision of this court, McGinness v. Interstate Commerce Commission, 662 F.2d 853 (D.C.Cir.1981), in which this court held that the Staggers Act amendment to section 10505 was intended to modify then existing exemptions from labor protection provisions granted to a class of rail carriers known as designated operators.
 
 
 28
 Petitioner's reliance on McGinness is inapposite. At issue in McGinness was the exemption granted designated operators from the merger and consolidation provisions of 49 U.S.C. Secs. 11343, 11347; in contrast, the issue in the instant case concerns exemptions from the statutory provisions involving rail line abandonments, 49 U.S.C. Secs. 10901, 10903. This court recognized in McGinness the differences between the two and carefully confined the holding of McGinness to the narrow class of designated operators.[48] McGinness left open the question of the effect of the Staggers Act on the scope of the exemptive authority involving abandonments, and, accordingly, we are not bound by that decision.
 
 
 29
 This is not to say that we need to rework entirely the field of statutory history we plowed in McGinness. As we noted in that decision, the conference report on the Staggers Act stated Congress's expectation that Commission exemptive orders made prior to the Staggers Act effective date would be modified only to the extent necessary to bring the exemptive orders within the limitations imposed by subsection (g).[49] We find, however, on review of the discretion granted the Commission by Congress in the design and implementation of labor protective provisions under 49 U.S.C. Sec. 10903(b)(2) in the case of abandonments, of prior Commission precedent in imposing labor protection in abandonment cases, and of the development of the feeder rail line program in the Staggers Act, that Congress did not intend to curtail the Commission's program to aid state rail programs when it modified section 10505 by adding subsection (g)(2).
 
 
 30
 Rail lines are abandoned for a variety of reasons: migration of major shippers to other locations, competition from other forms of transportation, or escalating operating costs that cause a rail line to become unprofitable.[50] Whatever the causes for termination, the Commission has carefully controlled the efforts of rail carriers to terminate service on a given line. Until the Staggers Act a rail carrier desiring to abandon a line applied to the Commission for permission; the Commission usually held hearings and granted permission to abandon the line only if it found that the public convenience and necessity did not require continuation of service over that line. If the Commission made such a finding, it issued a certificate of abandonment that granted the railroad formal permission to terminate service along the line.[51]
 
 
 31
 An important consideration in approving an abandonment is the need for provisions protecting the economic security of rail employees. In the usual abandonment case involving a common carrier continuing operations on another line, the carrier must forgo some of its long term savings from abandoning some service by absorbing the short term costs of labor protection. The costs of obtaining greater labor stability are thereby spread throughout the carrier's system. By avoiding the destabilizing effect that might follow from worker displacement, job protection has as its ultimate objective and primary justification the strengthening of the national transportation system.[52] Although individual employees are the primary beneficiaries of this policy, their interests are secondary to promoting the welfare of the national transportation system.
 
 
 32
 The statutory authority for the imposition of labor protective provisions in abandonment cases reposes in 49 U.S.C. Sec. 10903(b)(2) (Supp. IV 1980), which directs that the Commission shall provide labor protective provisions in abandonments at least as protective as those imposed in cases of mergers and consolidations under 49 U.S.C. Sec. 11347 (Supp. IV 1980). Even under the straightforward directive of section 10903(b)(2), however, the Commission possesses wide discretion to tailor employee protective provisions to the facts and circumstances attending a particular abandonment.[53] In cases of whole line abandonments, for example, in which the rail carrier is closing down its entire operation, the Commission has usually refrained from imposing any labor protection at all.[54] The policy of not imposing labor protection in whole line abandonments is based on the simple realization that there will remain no other rail services performed by the exiting carrier upon which to impose the costs of labor protection.[55] Any other result would simply tax the creditors of the abandoning carrier to provide labor with protection.[56] Other unusual circumstances can also justify the Commission's refusal to impose less labor protection than is customarily applied in the normal abandonment of part of a carrier's line.[57] Finally, it has been the long-standing practice of the Commission to impose labor protection only upon the exiting carrier, not upon a non-carrier that may acquire an abandoned line in order to resume service.[58]
 
 
 33
 Congress has recognized the need to balance competing policies in abandonment cases, and while making significant changes in the procedures and governing law to be applied in abandonments, it has left the Commission's policies toward labor protection largely untouched. The 4-R Act incorporated the labor protection standards applicable to mergers into abandonment proceedings, but did not alter the traditional "fair and equitable"[59] standard nor overturn the long-standing Commission policy toward labor protection in whole line abandonments.[60] Likewise, in the Staggers Act Congress made significant changes in the handling of applications for permission to abandon service but left unchanged the language relating to labor protection standards.[61] The Staggers Act, as noted earlier, modified the Commission's exemptive authority to prevent the Commission from exempting rail carriers from the labor protective provisions required by subtitle IV; this modification is a clear reference to the Commission's authority to impose, or decline to impose under existing law, labor protection in abandonment cases.
 
 
 34
 Nothing in the Commission's new rules threatens to change the protection provided labor in the usual abandonment case. Even under the abbreviated timetable for approving abandonments implemented by the Staggers Act, the Commission must still impose labor protection on the carrier abandoning service.[62] What the Commission did in promulgating its rules was to create a special class of carriers with modified service obligations reflecting the novel and unusual elements of this class of service.
 
 
 35
 Commission precedent and the statutory scheme under which the modified certificate program operates provide sufficient authority for the Commission to implement its modified certificate program. In the Tennessee Central Ry. Co. Abandonment proceeding,[63] for example, the Commission explicitly recognized the competing interests that must be reconciled in adopting employee protection conditions. In Tennessee Central service over the entire system of the exiting carrier was to be terminated, but three other carriers stood ready to purchase most of the abandoning carrier's lines and resume service. Even though the Commission had the apparent authority to impose labor protection on the carriers purchasing the lines, since permission to purchase the lines had to be obtained from the Commission, it refused to impose any such conditions.[64] The Commission realized that labor protection costs would jeopardize the resumption of service and subvert the broader goal of maintaining service when public necessity demanded.[65]
 
 
 36
 The state programs bear a close resemblance to the situation presented to the Commission in the Tennessee Central abandonment decision. Like the private carriers that stood ready to take over portions of the abandoned line in Tennessee Central, state governments are willing to undertake programs to retain local rail service. Given the vagaries of funding such programs,[66] the Commission quite properly found that the likelihood of states undertaking significant rail programs would be diminished if labor protection provisions were not modified to impose them only on the original carrier abandoning the line. Moreover, by continuing service along lines deemed uneconomic by private carriers, the state programs provide prospective employment opportunities to railway labor that would otherwise not exist.[67] In light of this, the congressional recognition of the competing interests involved in crafting labor protection provisions is especially significant.[68] Since the state rail programs present similar compelling concerns to continue service to shippers, the modified certificate program is consistent with the requirements of section 10903. Thus, the labor protective provisions as applied to the states in these circumstances do not seem to be part of a carrier obligation "required by this subtitle" and so are not subject to the bar of section 10505(g)(2).
 
 
 37
 Not only does the Commission's action seem consistent with traditional labor protection standards, but a review of the legislative history pertaining to the Commission's exemptive authority convinces us that Congress did not evince an intent in passing section 10505(g)(2) to require the Commission to curtail state rail programs by reimposing potentially costly labor protection on the states. Both the House and Senate versions of the legislation that eventually became the Staggers Act contained new versions of section 10505. The Senate version of section 10505 was characterized as merely a restatement of the Commission's exemptive authority in clearer terms.[69] The Senate version continued the "limited scope" restriction on the use of the Commission's exemptive powers if the potential for abuse of market power was present. In such cases, exemptions could be granted, as before, only if the Commission found the exemption to be of limited scope and not necessary to carry out the national transportation policy. Where the potential abuse of market power was absent, the "limited scope" provision did not apply and findings were not necessary. While the Senate amendments to section 10505 imposed other restrictions on the Commission's exemptive authority, the Senate version of section 10505 made no reference to labor protection.
 
 
 38
 In large part the House amendments to section 10505 were identical to the Senate version. The committee report characterized the House amendments as clarifying and broadening the Commission's exemptive authority under section 10505.[70] Unlike the Senate version, however, the House amendments to section 10505 contained a provision affecting the Commission's authority to exempt a rail carrier from the labor protective provisions of the ICA. The language of that provision remained unchanged in the final version of the Staggers Act.[71] In reporting this restriction, the committee characterized the change as "minor" and "prospective,"[72] an interpretation that conflicts with the conference report.[73]
 
 
 39
 The Senate version of the Staggers Act, S. 1946, was reported out of committee on December 7, 1979,[74] and the House bill, H.R. 7235, on May 16, 1980.[75] Lengthy debate followed in both houses, but neither counsel nor our own research has disclosed any discussion in either house on the effect of the section 10505 amendments on the development of state rail programs. The possible effect of the Staggers Act on these state rail programs was discussed in three other contexts in the House bill, however. Section 304 of H.R. 7235 contained a provision extending labor protection to employees affected by the construction or extension of a rail line. Section 309 required the imposition of labor protection in cases of abandonments made by a bankrupt carrier. Section 502 had a provision relating to employee protection in instances in which a state or other entity acquired a rail line.[76] Because two of these provisions, sections 304 and 309, present the same basic concerns that underlie all rail labor protection, and because all three sections of H.R. 7235 operate in the same statutory framework of labor protection as that invoked by the House amendment to section 10505, it is worthwhile to examine the discussion of these three provisions closely. The intentions of Congress in passing these provisions help illuminate what Congress probably intended in passing the amendments to section 10505.
 
 
 40
 Section 304 of H.R. 7235 liberalized the standards a railroad has to meet in order to obtain Commission approval to enter a new market by constructing or extending a rail line. In discussing section 304, the committee stressed the need for increased competition and sought to encourage greater intra-modal competition between railroads by easing carriers' access to new markets.[77] The Senate bill contained a substantially similar version relating to new construction and entry, but only the House version provided any protection for labor.[78] As reported out by the House committee, section 304(e) of H.R. 7235 required the Commission to impose employee protection on any rail carrier constructing or extending a rail line.[79] The committee stated that it was also its intent to extend the benefits of employee protection not only to the employees of the entering carrier, but also to those employees of other railroads that were affected by the proposed extension.[80] This statement suggests an intent to change existing law, since the Commission had in other cases refused to extend employee protection to employees of railroads not involved in the transaction.[81]
 
 
 41
 Section 309 of H.R. 7235 required employee protection conditions to be imposed in cases in which a carrier was acquiring the lines of a bankrupt carrier that was operating under chapter 11 of the Bankruptcy Act of 1978. The committee report characterized this section as merely placing employees of railroads proceeding in bankruptcy under the 1978 Act on par with employees of rail carriers that petitioned for bankruptcy under the old bankruptcy code.[82] The Senate bill contained no similar provision.[83]
 
 
 42
 Concern for local rail services was also expressed in section 502 of H.R. 7235, which established a feeder line program facilitating the conveyance of rail lines abandoned by neglect or with formal Commission approval to other parties who would operate the lines as part of a local rail system.[84] Found only in the House bill, this program was designed to complement the Local Rail Service Assistance Act of 1978 and existing provisions of the ICA.[85] Because of its central importance to this case, it is useful to examine the House program in detail.
 
 
 43
 The feeder rail program compels the Commission to order a rail carrier to sell a line to a financially responsible person if the Commission finds either that the public convenience and necessity permitted the sale or that the line had been listed as subject to abandonment. The first condition for sale can be met over the carrier's objection if the prospective purchaser proves that the existing carrier refuses to provide adequate service within a reasonable time to shippers. Eligible purchasers are those persons, including states, who are capable of paying the legal minimum price and providing service for at least three years. Expressly excluded from this category, however, are class I and class II railroads.[86] Congress also limited the rail lines that can be purchased under this program; for the first three years after the effective date of the Staggers Act only lines that carried less than 3,000,000 gross ton-miles of freight in the previous calendar year can be purchased. Thereafter, any line can be purchased under the aegis of section 10910. Although selling carriers were expressly required to provide normal labor protection to their employees, any person operating a line under this section can elect to be exempt from nearly all provisions of the ICA, including the labor protection provisions of 49 U.S.C. Sec. 10903.[87] In fact, the only labor protection Congress imposed on the acquiring party is the mandate to the Commission to require the purchasing party to hire displaced employees of the exiting carrier to the maximum extent practicable. Finally, Congress made the exemption retroactive, allowing any eligible person who had acquired a line abandoned within the eighteen months before the effective date of the Staggers Act to take advantage of the exemption.[88]
 
 
 44
 During the House debate on the Staggers Act, two members raised serious questions concerning the effect of sections 304(e) and 309 on state rail programs. Congressman Abdnor of South Dakota discussed the problems faced by South Dakota following the collapse of the bankrupt Milwaukee Road, since that carrier had over 1,320 miles of rail line in the state. Congressman Abdnor stated, "it is my understanding, however, that the committee will offer changes in these sections [304, 309] to insure that neither the State nor any operator the State may retain will be burdened with labor protection costs in maintaining service on rail lines abandoned by other carriers."[89] Congressman Florio, floor manager of the bill and chairman of the subcommittee that originated H.R. 7235, assured Congressman Abdnor that the committee would "offer language to alleviate the concern of the State of South Dakota with regard to labor protection costs."[90] Later in the debate on H.R. 7235, Representative Kastenmeier of Wisconsin, another state with an extensive rail service program, directed the House's attention to the possibility that section 304(e) might be interpreted to require states operating abandoned rail lines to provide labor protection programs.[91] Again Congressman Florio answered with strong assurances: "[I]t has never been the intention of the committee to apply section 304(e) to a rail carrier or other entity that is proposing solely to operate or acquire an existing line."[92]
 
 
 45
 We find this last comment of Congressman Florio especially significant because section 304(e) brought into play the same labor protection provisions that the petitioner now says must be imposed by reason of the amendments to section 10505. On the contrary, these colloquies on the floor of the House, where the disputed provision of section 10505 originated, indicate most dramatically that Congress was made aware of the concerns of the states in responding to the opportunities to preserve rail service presented to them by Congress in earlier legislation. Indeed, a review of changes made in section 304(e) indicates that Congress took the concerns of Representatives Abdnor and Kastenmeier to heart. The enacted version of the provision relating to rail entry gives the Commission express discretion to determine whether labor protection conditions are needed, and further clarified the language of section 10901 to indicate that labor protection only applies to new line construction.[93]
 
 
 46
 Notwithstanding Congressman Florio's response to the statement of Congressman Abdnor, no changes were made in the text of section 309.[94] Given the committee's characterization of that section as merely placing all rail employees on an equal footing in bankruptcy proceedings, and Congressman Florio's direct statement that section 309 would have no impact on state rail programs, it is clear that Congress intended no substantive changes in the labor requirements imposed under 49 U.S.C. Sec. 11347 when it enacted section 309. Moreover, at least one court has found that section 11347 does not require non-carriers purchasing rail lines abandoned by bankrupt carriers to assume the burden of labor protection for the employees of the abandoning carrier. In re Chicago, St. Paul & Pacific R.R. Co., 658 F.2d 1149, 1168-69 (7th Cir.1981).
 
 
 47
 The House debate on section 502 illuminates Congress's awareness of recent Commission actions to exempt state rail programs from Commission regulations. In proposing the adoption of the feeder rail line program, Congressman Madigan of Illinois stated: "The Interstate Commerce Commission has, by regulation, already exempted lines approved for abandonment by the Commission or a bankruptcy court from many Commission regulations if States provide financial assistance to these lines. My amendment [to section 502] extends certain exemptions to the person acquiring a line."[95] Floor manager Congressman Florio responded, "[T]his provision is one of the really truly innovative new programs that is being incorporated into this legislation."[96] Comments from other congressmen were equally favorable.[97] The endorsement given the feeder line program in the House was modified only slightly in conference, the most pertinent change being the elimination of the 3,000,000 ton-mile limitation after three years.[98]
 
 
 48
 In sum, several reasons compel our conclusion that the Commission's modified certificate program is consistent with the changes made by the Staggers Act to the Commission's exemptive powers. Even under the substantive labor protective provisions imposed by 49 U.S.C. Sec. 11347, the Commission still possesses discretion to impose labor protection in cases of whole line abandonments. The balancing of competing interests inherent in that grant of congressional discretion in section 10903(b)(2)--improved labor relations versus continued service and creditor protection--is likewise present in the modified certificate program. Given the congressional delegation of responsibility to the states to preserve local rail service in earlier legislation, as well as in the Staggers Act, and the directive to the Commission to cooperate with the states, the Commission had the authority to establish its modified certificate program.
 
 
 49
 This conclusion is further supported by our review of the legislative history of certain provisions of the Staggers Act. It is abundantly evident that Congress desired to facilitate the development of state rail programs, a policy established initially in the 4-R Act and continued in the Staggers Act. The reaction of the House leadership shepherding the Staggers Act through that chamber to concerns expressed over the potential effect of sections 304 and 309 of H.R. 7235 is a strong indication that Congress did not intend to interfere with state rail assistance programs when modifying section 10505 of the ICA. More significantly, the Commission's modified certificate program closely parallels the feeder rail line program implemented by 49 U.S.C. Sec. 10910, differing only to the extent that the Commission's exemptive power reaches back further in time to encompass state programs started well before the Staggers Act. Even so, the class of prospective operators given exemptions under the modified certificate program is smaller than the class eligible for exemption under section 10910. Moreover, since the modified certificate program is available only to states, it is consistent with the broader policy objective enunciated by Congress in 49 U.S.C. Sec. 10101(a)(5). The restriction imposed by section 10505(g)(2) makes no express provision for the role of the states in assisting in the provision of rail services, probably because Congress's primary concern in adding that restriction was the possibility that the Commission would exempt existing private, non-subsidized rail carriers from the employee protection provisions of sections 10903 and 11347. That the Commission has not done.
 
 
 50
 C. The Adequacy of the Commission's Findings
 
 
 51
 To exercise its exemptive authority, the Commission must make certain findings regarding the nature and scope of the exemption to be issued. Although the Commission acted under section 10505(a) as it existed in 1980, the standards that will govern the Commission's use of its exemptive powers on remand are those implemented by the Staggers Act:[99] the Commission must find that the relevant provisions of the ICA are not necessary to carry out the transportation policy of section 10101(a) of Title 49; and that the transaction or service is either of limited scope or is not needed to protect shippers from the abuse of market power.[100] Accordingly, we shall determine whether the Commission's findings measure up to those standards.[101]
 
 
 52
 Petitioner asserts that the findings made by the Commission are inadequate or simply erroneous. In support of this assertion, he argues that the Commission's findings are merely conclusory, failing to do more than restate the statutory language without applying the legal standard governing the use of the Commission's exemptive authority to the facts of the proceeding.[102] Further, petitioner argues that the Commission's finding that relatively little trackage is involved is simply erroneous and, thus, the matter cannot be of limited scope.[103]
 
 
 53
 Our analysis of the adequacy of the Commission's findings must reflect the very narrow scope of review we apply to such findings; as a rulemaking proceeding we are limited to determining whether the Commission's decision was arbitrary, capricious, an abuse of discretion or otherwise contrary to law.[104] It is not our province to assess the wisdom of the rule, but simply to determine whether there are facts in the record capable of supporting the agency's findings.[105] If the facts provide a rational basis for the Commission's decision to implement the modified certificate program, the Commission's decision must be affirmed.[106]
 
 
 54
 In addressing the limited scope requirement, the Commission observed that the trackage being abandoned constituted only a small percentage of total rail trackage in the United States and that the average length of the lines being approved for abandonment was quite short.[107] The Commission found that, out of this set of potential state-operated trackage, states were interested in only a small fraction.[108] In addition, abandoned lines were either unprofitable or only marginally profitable and had sparse traffic levels.[109]
 
 
 55
 These findings alone, we believe, meet the statutory requirement that the involved matter be of limited scope. In an absolute sense, the small amounts of trackage and traffic involved in the modified certificate program compel a conclusion that the program is limited in scope. Although, as the petitioner points out, two bankruptcies of major carriers and Conrail's planned abandonments indicate that the amount of trackage potentially eligible for the Commission's program will increase,[110] the Commission was well aware of this possibility when it made its findings.[111] In fact, it cited the bankruptcies as additional reasons for assisting the states in their rail programs.[112] Furthermore, the words "limited scope" necessarily give the Commission broad discretion in interpreting their meaning, since the agency's judgment and expertise are involved in applying the words "limited scope" to any set of circumstances.[113] Thus, we find it was not an abuse of discretion to rely on the fact that limited trackage and rail traffic will be affected to determine that the matter was of limited scope.
 
 
 56
 The Commission also had to find that the application of a provision of the ICA was not necessary to carry out the transportation policy of 49 U.S.C. Sec. 10101(a).[114] The effect of the modified certificate program was to exempt states, or their operators, from the filing procedures and other restrictions contained in 49 U.S.C. Secs. 10901, 10903, and 11101. The Commission observed that service over these lines was "in danger of immediate termination" and that requiring an application prior to starting operations could "result in temporary cessation of service."[115] Furthermore, termination of service under normal procedures could involve months of delay.[116] These reasons led the Commission to conclude that full application of the ICA to the states was not necessary to carry out the national transportation policy of section 10101(a).[117]
 
 
 57
 Petitioner argues, however, that we should parse the Commission's modified certificate program into separate exemptions and hold that separate findings had to be made for each of the exemptions, which, he asserts, the Commission did not do.[118] We decline to accept this suggestion, because the modified certificate program operates as a unified program initiated by state acquisition of a line already abandoned or approved for abandonment and completed by the provision of service under the state's rail program. Separate findings couched expressly in the statutory terms are not necessary for each statutory provision in this case, when the Commission adequately explained the justification for exempting the state rail programs from these particular provisions of the ICA.
 
 
 58
 Petitioner also attacks the Commission's modified certificate program on other grounds. In reaching its final decision the Commission said it would follow a policy that mere ownership of a line by a state does not create common carrier status.[119] Yet in its final decision, the Commission stated that state acquisition of a line over which service was being provided would entail common carrier obligations.[120] Petitioner attempts to make a meaningful distinction between the two statements and asserts that such inconsistency cannot stand without a reasoned explanation.[121] In addition, petitioner asserts that the Commission exceeded its statutory authority in addressing the common carrier status of states maintaining rail service programs and that the Commission cannot administer statutory programs outside its jurisdiction, such as the Federal Employers' Liability Act.[122]
 
 
 59
 With this latter point we agree, but the Commission made no such attempt. Instead it established a limited exemption from common carrier status under the ICA to states that merely own rail lines and provide financial assistance to service providers. A fair reading of the Commission's decision does not show any meaningful inconsistency between the final decision and the modification of the final decision. In both the Commission recognized that application of the traditional test of a common carrier would make both the state and its operator common carriers. What the Commission did in its final decision was to exempt a state from common carrier status and the attendant obligations under the ICA so long as the state did not operate the rail line. We need not decide today the dividing line between mere ownership and operation nor determine the implications of the Commission's exemption on common carrier obligations in situations outside the ICA.
 
 IV. CONCLUSION
 
 60
 For the foregoing reasons, the decision of the Commission is
 
 
 61
 Affirmed.
 
 
 
 [1]
 See, e.g., H.R.REP. NO. 1482, 95th Cong., 2d Sess. 5-11 (1978), U.S.Code Cong. & Admin.News 1978, p. 7505 (committee report accompanying H.R. 11979, the Local Rail Service Assistance Act of 1978); S.REP. NO. 499, 94th Cong., 1st Sess. 2-8, 39-44 (1975), U.S.Code Cong. & Admin.News 1976, p. 14 (committee report accompanying S. 2718, the 4-R Act)
 
 
 [2]
 See Regional Rail Reorganization Act of 1973 (3-R Act), Secs. 301-304, 87 Stat. 985, 1004-09
 
 
 [3]
 See 3-R Act, Secs. 205-206, 401-403, 87 Stat. 985, 993-97, 1010-12
 
 
 [4]
 Ch. 104, 24 Stat. 379 (1887)
 
 
 [5]
 Pub.L. No. 94-210, 90 Stat. 31
 
 
 [6]
 See H.R.REP. NO. 1035, 96th Cong., 2d Sess. 34-39 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978; Staff of House Comm. on Interstate and Foreign Commerce, 96th Cong., 2d Sess., The Rail Act of 1980: Background Materials 17-42 (Comm. Print 96-IFC 45 1980)
 
 
 [7]
 For 1978, 1979, and 1980 carriers filed petitions to abandon 3,379, 4,421, and 4,784 miles of track, respectively. See 92d Annual Report of the Interstate Commerce Commission 33 (1978); 93rd Annual Report of the Interstate Commerce Commission 41 (1979); Ninety-fourth Annual Report of the Interstate Commerce Commission 39 (1980)
 
 
 [8]
 See, e.g., Railroad Deregulation Act of 1979: Hearings Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation, 96th Cong., 1st Sess. 1021-25, 1098-1139 (1979) (remarks of Robert Freiberg, statement of Dennis Potter)
 
 
 [9]
 See S.REP. NO. 470, 96th Cong., 1st Sess. 5 (1979)
 
 
 [10]
 See generally H.R.REP. NO. 1482, 95th Cong., 2d Sess. 6-7 (1978); Local Rail Service Continuation Assistance: Hearings Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce [hereinafter Local Rail Service Hearings ], 95th Cong., 1st Sess. 130-31, 267-68 (1977) (statements of John Killoran, Peter Metz)
 
 
 [11]
 The changes made by the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub.L. No. 94-210, 90 Stat. 31, were directed at two goals: increasing the speed with which the Commission disposed of abandonment applications and focusing the planning process of local rail service programs by requiring railroads either to identify which lines faced future abandonment or risk protracted abandonment proceedings. See 4-R Act, Sec. 802, 90 Stat. 31, 127-30. In the Staggers Act Congress further increased the efficiency by which abandonment applications were processed: unopposed applications had to be approved within 45 days of the application, while applications engendering opposition had to be disposed of within 165 days of the date of application. See Staggers Act, Sec. 402(a)(3), 94 Stat. 1895, 1941-42 (amending 49 U.S.C. Sec. 10904(c) (Supp. IV 1980))
 
 
 [12]
 See Staggers Act, Secs. 401, 402, 94 Stat. 1895, 1939-45 (codified at 49 U.S.C. Sec. 10905 (Supp. IV 1980)). Section 10905 presently allows a "financially responsible person" to offer to purchase a line approved for abandonment. If the rail carrier and the offeror fail to agree on the price and other terms of purchase, the Commission may set the terms of sale upon request by either party to the transfer. See generally Chicago and Northwestern Transportation Co.--Abandonment, 363 I.C.C. 956 (1981) (first application of Sec. 10905). Section 10910 also permits a "financially responsible person" to compel the sale of a rail line, but this latter provision can operate even if no formal abandonment application has been filed. 49 U.S.C. Sec. 10910(b)(1) (Supp. IV 1980). See text accompanying notes 84-88 infra
 
 
 [13]
 See 4-R Act, Pub.L. No. 94-210, Secs. 501-509, 805, 90 Stat. 31, 66-76, 139-43; Staggers Act, Pub.L. No. 96-448, Secs. 401-402, 404-406, 94 Stat. 1895, 1939-45, 1945-47
 
 
 [14]
 See, e.g., the comments filed in connection with the proceeding at issue here by the states of Wisconsin and South Dakota, Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions [hereinafter Common Carrier Status of States], Agency Record (A.R.) at 49-50, 81-83; Brief for Intervenor Iowa Department of Transportation at 1-2. See also Local Rail Service Hearings, supra note 10 at 119-24, 128-34, 273-79 (comments of state officials from Iowa, West Virginia and Illinois)
 
 
 [15]
 See Brief for Intervenor South Dakota at 3
 
 
 [16]
 See, e.g., Local Rail Service Hearings, supra note 10, at 119-26 (program for the State of Iowa); Comments of the Wisconsin Dep't of Transportation, Common Carrier Status of States, A.R. at 49
 
 
 [17]
 Letter from Edward J. Schack, Finance Section of the Commission, to Madeleine S. Bloom, Federal Rail Administration (June 1, 1978), reprinted in Petition for Clarification and Waiver, Common Carrier Status of States, A.R. at 13-14
 
 
 [18]
 Petition for Clarification and Waiver by Arizona, Delaware, Georgia, Illinois, Massachusetts, Mississippi, North Carolina, Ohio, South Dakota, Vermont, Virgina, West Virginia, Wisconsin and the Accomack-Northampton Transportation District of Virginia (March 20, 1979), Common Carrier Status of States, A.R. at 1-14. A determination that states are common carriers under the Interstate Commerce Act (ICA), Ch. 104, 24 Stat. 379 (1887), will confront states with a host of obligations under the ICA, whether they undertake to provide rail services directly or through a contract operator. For example, the ICA gives the Commission authority over rates and terms of service, see 49 U.S.C. Secs. 10704-10705, 10707 (Supp. IV 1980), acquisition, construction and abandonment of rail lines, see 49 U.S.C. Secs. 10901, 10903 (Supp. IV 1980), and issuance of securities to finance rail operations, see 49 U.S.C. Sec. 11301 (Supp. IV 1980). The possible far reaching effect of Commission jurisdiction over state rail operations, and the attendant administrative and financial burdens that might ensue from common carrier status, were serious concerns to the states. Petition for Clarification and Waiver, Common Carrier Status of States 6-8, A.R. at 7-9
 
 
 [19]
 Id. at 2-3, A.R. at 4
 
 
 [20]
 Id. at 2, 4-7, A.R. at 3, 8-9
 
 
 [21]
 Id. at 5-6, A.R. at 6-7. Protective provisions for railway labor in the usual abandonment case are mandated by 49 U.S.C. Sec. 10903(b)(2) (Supp. IV 1980), which requires protective provisions at least as protective as those called for in 49 U.S.C. Sec. 11347 (Supp. IV 1980). Although Sec. 11347 requires that any employee affected by a merger, consolidation, and, because of Sec. 10903(b)(2), abandonments, to be in no worse position than prior to the merger, consolidation or abandonment for a period of four years, the Commission has imposed a six-year period of job protection in the usual merger or abandonment case. See New York Dock Ry.--Control, 360 I.C.C. 60, 76 (1979) (merger proceeding); Oregon Short Line R. & The Union Pac. R. Co.--Abandonment (Goshen) (Oregon Short Line III), 360 I.C.C. 91, 98 (1979) (abandonment proceeding). The Commission's labor protection provisions mean that the employee's average monthly compensation after a merger or abandonment shall remain the same for a period equal to the employee's employment with the carrier prior to the merger or abandonment, up to a maximum of six years. The Commission also requires that the guaranteed monthly compensation be adjusted to reflect general wage increases, id. at 99, that fringe benefits be maintained during the protective period, id. at 100, and that moving expenses be paid to those employees forced to change their place of employment, id. at 101. See also New York Dock Ry. v. United States, 609 F.2d 83, 86-90 (2d Cir.1979) (history of labor protection in the rail industry)
 
 
 [22]
 Petition for Clarification and Waiver, Common Carrier Status of States at 8, A.R. at 9. See, e.g., Comments of the Wisconsin Dep't of Transportation, Common Carrier Status of States, A.R. at 51-52
 
 
 [23]
 See 45 Fed.Reg. 19,585 (1980)
 
 
 [24]
 Id
 
 
 [25]
 Id. at 19,585-86
 
 
 [26]
 Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions, 363 I.C.C. 132 (1980). The Commission's rules are codified at 49 C.F.R. Secs. 1120A.1-.4 (1981)
 
 
 [27]
 See Common Carrier Status of States, 363 I.C.C. 132, 134-39 (1980)
 
 
 [28]
 49 U.S.C. Sec. 10505(a) (Supp. III 1979). Under 49 U.S.C. Sec. 10505(a), as it read at the time of the Commission's 1980 decision, the Commission was authorized to "exempt a person, class of persons, or a transaction or service, because of the limited scope of the transaction or service, when the Commission finds that the application of a provision of this subtitle--(1) is not necessary to carry out the transportation policy of section 10101 of this title; (2) would be an unreasonable burden on a person, class of persons, or interstate and foreign commerce; and (3) would serve little or no useful public purpose."
 
 
 [29]
 Common Carrier Status of States, 363 I.C.C. 132, 135 (1980)
 
 
 [30]
 Id. at 137
 
 
 [31]
 Id. at 136
 
 
 [32]
 See 46 Fed.Reg. 37,702 (1981)
 
 
 [33]
 Illinois Legislative Director for the United Transportation Union
 
 
 [34]
 49 U.S.C. Sec. 10505(a) (Supp. IV 1980)
 
 
 [35]
 49 U.S.C. Sec. 10505(c), (d) (Supp. IV 1980)
 
 
 [36]
 Pub.L. No. 94-210, Sec. 207, 90 Stat. 31, 42; see S.REP. NO. 499, 94th Cong., 1st Sess. 53 (1975)
 
 
 [37]
 See S.REP. NO. 499, 94th Cong., 1st Sess. 53 (1975); H.R.REP. NO. 725, 94th Cong., 1st Sess. 75 (1975). The provision granting the Commission exemptive powers, originally Sec. 12(1)(b) of the Interstate Commerce Act (ICA), Ch. 104, 24 Stat. 379 (1887), was recodified in 1978 as 49 U.S.C. Sec. 10505 by Pub.L. No. 95-473, Sec. 1, 92 Stat. 1361. No substantive changes were made by that law
 
 
 [38]
 H.R.REP. NO. 768, 94th Cong., 1st Sess. 125 (1975) (report of the Conference) (emphasis added)
 
 
 [39]
 H.R.REP. NO. 1035, 96th Cong., 2d Sess. 60 (1980)
 
 
 [40]
 H.R.REP. NO. 1430, 96th Cong., 2d Sess. 105 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3978, 4137
 
 
 [41]
 See note 28 supra
 
 
 [42]
 The present text of 49 U.S.C. Sec. 10505(a) (Supp. IV 1980) reads as follows:
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, a class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle--
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 
 
 [43]
 49 U.S.C. Sec. 10505(c) (Supp. IV 1980)
 
 
 [44]
 Id. Sec. 10505(d) (Supp. IV 1980)
 
 
 [45]
 Id. Sec. 10505(a)(1) (Supp. IV 1980); id. Sec. 10101(a) (Supp. III 1979 and Supp. IV 1980)
 
 
 [46]
 See 49 U.S.C. Sec. 10903(b)(2) (Supp. IV 1980)
 
 
 [47]
 Id. Sec. 10505(g)(2) (Supp. IV 1980)
 
 
 [48]
 See 662 F.2d at 860 n. 24. Designated operators are companies operating rail lines subsidized under authority established in the 3-R Act. 3-R Act, Sec. 304(c), (d), 87 Stat. 985, 1008-09; McGinness, 662 F.2d at 854 n. 2
 
 
 [49]
 662 F.2d at 858 (citing H.R.REP. NO. 1430, 96th Cong., 2d Sess. 105 (1980))
 
 
 [50]
 See S.REP. NO. 499, 94th Cong., 1st Sess. 2-3 (1975) (committee report on the 4-R Act); see also H.R.REP. NO. 1482, 95th Cong., 2d Sess. 7 (1978) (committee report accompanying H.R. 11979, the Local Rail Service Assistance Act of 1978)
 
 
 [51]
 See 49 U.S.C. Sec. 1a (1976) (recodified at 49 U.S.C. Sec. 10903) (Supp. IV 1980)). Congress implemented certain procedural and substantive reforms to abandonment cases in the 4-R Act. See 4-R Act, Pub.L. No. 94-210, Sec. 802, 94 Stat. 31, 127-30. The 4-R Act required the Commission to investigate an abandonment application within three months and eliminated the so-called "34-car" rule, whereby a presumption in favor of abandonment was created if a line had carried fewer than 34 carloads of freight per mile during the previous 12 months. Instead, the carrier had to establish that the public convenience and necessity would be served if abandonment were permitted. See H.R.REP. NO. 781, 94th Cong., 2d Sess. 218-19 (1976) (conference report accompanying 4-R Act); S.REP. NO. 499, 94th Cong., 1st Sess. 39-41 (1975) (committee report on 4-R Act)
 
 
 [52]
 See, e.g., Interstate Commerce Commission v. Railway Labor Executives Ass'n, 315 U.S. 373, 377-78, 62 S.Ct. 717, 720-721, 86 L.Ed. 904 (1942); Mariana & Blountstown R. Abandonment, 348 I.C.C. 507, 515 (1976); Seaboard Air Line R. Co. Trackage Rights, 312 I.C.C. 797, 800 (1962); see also Tennessee Central Ry. Co. Abandonment, 334 I.C.C. 235, 246 (1969), supplementing 333 I.C.C. 443 (1968)
 
 
 [53]
 See In re Chicago, Milwaukee, St. P. & Pac. R.R. Co., 658 F.2d 1149 (7th Cir.1981); New York Dock Ry. v. United States, 609 F.2d 83, 91-92 (2d Cir.1979); American Train Dispatchers Ass'n v. Interstate Commerce Commission, 578 F.2d 412 (D.C.Cir.1978)
 
 
 [54]
 See, e.g., Northampton & Bath R. Co.--Abandonment, 354 I.C.C. 784, 785-86 (1978); Bush Terminal R. Co.--Entire Line Abandonment, 342 I.C.C. 34, 50-51 (1971); Okmulgee Northern Ry. Co.--Abandonment, 320 I.C.C. 637, 645-46 (1964)
 
 
 [55]
 See Northampton & Bath R. Co. Abandonment, 354 I.C.C. 784, 786 (1978)
 
 
 [56]
 See Tennessee Central Ry. Co. Abandonment, 333 I.C.C. 443, 454 (1968)
 
 
 [57]
 See In re Chicago, Milwaukee, St. P. & Pac. R.R. Co., 658 F.2d 1149, 1153 (7th Cir.1981)
 
 
 [58]
 See id. at 1169-70. Cf. American Train Dispatchers Ass'n v. Interstate Commerce Commission, 578 F.2d 412 (D.C.Cir.1978) (declining to impose labor protection on behalf of employees hired or promoted after a merger)
 
 
 [59]
 49 U.S.C. Sec. 5(2)(f) (1976). The recodification of Sec. 5(2)(f) into 49 U.S.C. Sec. 11347 substituted the word "fair" for the words "fair and equitable." No substantive change was effected by this revision. See 49 U.S.C. Sec. 11347 (Supp. IV 1980) (revisor's note)
 
 
 [60]
 See S.REP. NO. 781, 94th Cong., 2d Sess. 218-19 (1976) (conference report accompanying 4-R Act)
 
 
 [61]
 Cf. Pub.L. No. 96-448, Sec. 402, 94 Stat. 1895, 1941-45 (amending 49 U.S.C. Sec. 10903); H.R.REP. NO. 1430, 96th Cong., 2d Sess. 125 (1980) (no changes made to labor protection imposed under 49 U.S.C. Sec. 10903(b)(2))
 
 
 [62]
 See 49 U.S.C. Sec. 10903(b)(2) (Supp. IV 1980)
 
 
 [63]
 333 I.C.C. 443 (1968), continued at 334 I.C.C. 235 (1969)
 
 
 [64]
 Id. at 245
 
 
 [65]
 Id. at 246. See Okmulgee Northern Ry. Co. Abandonment, 320 I.C.C. 637, 640 (1964)
 
 
 [66]
 Funding is typically short term, see Petition for Clarification and Waiver, A.R. at 6-7, while the labor protection provisions usually impose six-year job protection requirements, by guaranteeing covered workers' salaries at full pay for up to six years. See, e.g., Oregon Short Line III, 360 I.C.C. 91, 98-100 (1979); New York Dock Ry.--Control, 360 I.C.C. 60, 76-79 (1979)
 
 
 [67]
 Cf. Tennessee Central Ry. Co. Abandonment, 334 I.C.C. 235, 246 (1969) (urging successor carriers to hire displaced employees)
 
 
 [68]
 See text accompanying notes 56-57 supra
 
 
 [69]
 See S.REP. NO. 470, 96th Cong., 1st Sess. 43 (1979)
 
 
 [70]
 H.R.REP. NO. 1035, 96th Cong., 2d Sess. 60 (1980)
 
 
 [71]
 Id. (citing H.R. 7235, 96th Cong., 2d Sess. Sec. 209 (1980)); see Staggers Act, Pub.L. No. 96-448, Sec. 213, 94 Stat. 1895, 1912-13
 
 
 [72]
 H.R.REP. NO. 1035, 96th Cong., 2d Sess. 60 (1980)
 
 
 [73]
 See H.R.REP. NO. 1430, 96th Cong., 2d Sess. 105 (1980)
 
 
 [74]
 125 Cong.Rec. S18,078 (daily ed. Dec. 7, 1979)
 
 
 [75]
 126 Cong.Rec. H3903 (daily ed. May 20, 1980)
 
 
 [76]
 Section 304(b) was eventually enacted as section 221 of the Staggers Act, while sections 309 and 502 were enacted as sections 227 and 401 of the Staggers Act, respectively. See Staggers Act, Secs. 221, 227 and 401, Pub.L. No. 96-448, 94 Stat. 1895, 1928-29, 1931, 1939-41. See also H.R.REP. NO. 1430, 96th Cong., 2d Sess. 115-16, 119-20, 124-25 (1980)
 
 
 [77]
 H.R.REP. NO. 1035, 96th Cong., 2d Sess. 66-67 (1980)
 
 
 [78]
 Compare S. 1946, Sec. 203, 96th Cong., 1st Sess. (1979), reprinted in S.REP. NO. 470, 96th Cong., 1st Sess. 64-65 (1969), with H.R. 7235, Sec. 304, reprinted in H.R.REP. NO. 1035, 96th Cong., 2d Sess. 16, 168-69 (1980)
 
 
 [79]
 H.R.REP. NO. 1035, 96th Cong., 2d Sess. 16, 67 (1980)
 
 
 [80]
 Id. at 67
 
 
 [81]
 See, e.g., Southern Ry. Co. Control--Central of Georgia Ry. Co., 317 I.C.C. 557, 567-68 (1962); Seaboard Air Line R.R. Co.--Control, 312 I.C.C. 507, 512 (1961); Baltimore & Ohio R.R. Co.--Operation, 261 I.C.C. 615, 619-21 (1946)
 
 
 [82]
 See H.R.REP. NO. 1035, 96th Cong., 2d Sess. 69 (1980)
 
 
 [83]
 See H.R.REP. NO. 1430, 96th Cong., 2d Sess. 119 (1980) (report of the Conference)
 
 
 [84]
 Staggers Act, Pub.L. No. 96-448 Sec. 401(a), 94 Stat. 1985, 1939-41 (codified at 49 U.S.C. Sec. 10910 (Supp. IV 1980))
 
 
 [85]
 H.R. 7235, 96th Cong., 2d Sess. (1980), Sec. 502, reprinted in H.R.REP. NO. 1035, 96th Cong., 2d Sess. 22-23 (1980); see id. at 124
 
 
 [86]
 Class I railroads have annual operating revenues of $50 million or more, while Class II railroads must have revenues in excess of $10 million but less than $50 million. 49 C.F.R. Sec. 1201 at 1-1 (1981). We view this exclusion as significant, since it expresses an intent of Congress to limit the availability of section 10910 purchases to state or local governments, shippers' associations, or small carriers. Because section 10910 permits any operator, regardless of size, to exempt himself from nearly all provisions of the ICA, including labor protection, the exclusion of large carriers from the right to purchase a line under section 10910 indicates that Congress did not want to allow section 10910 to be used as a back door means of altering the framework of existing labor protection for the majority of rail employees. Although section 10910 has no express connection with the modifications made to section 10505 by the Staggers Act, the limited scope of the Commission's modified certificate program is consistent with the concern implicit in section 10910
 
 
 [87]
 49 U.S.C. Sec. 10910(g)(1) (Supp. IV 1980); see H.R.REP. NO. 1430, 96th Cong., 2d Sess. 124-25 (1980) (report of the Conference)
 
 
 [88]
 49 U.S.C. Sec. 10910(g)(2) (Supp. IV 1980)
 
 
 [89]
 126 Cong.Rec. H8564 (daily ed. Sept. 9, 1980)
 
 
 [90]
 Id
 
 
 [91]
 Id. at H8587
 
 
 [92]
 Id
 
 
 [93]
 Staggers Act, Pub.L. No. 96-448, Sec. 221(b), 94 Stat. 1895, 1928
 
 
 [94]
 Enacted as section 227 of Pub.L. No. 96-448, 94 Stat. 1895, 1931
 
 
 [95]
 126 Cong.Rec. H8592 (daily ed. Sept. 9, 1980). The amendment Congressman Madigan referred to was his proposed amendment to the version of the feeder rail line program reported out of the committee. Congressman Madigan's proposal made several changes to the feeder rail program provisions. One of the most important of these was the provision permitting a purchaser to compel the sale of a line when the existing rail carrier had effected a de facto abandonment by providing poor service. None of Congressman Madigan's changes, which were adopted by Congress, 126 Cong.Rec. H8592 (daily ed. Sept. 9, 1980), affect our analysis of the effect of the Staggers Act on the Commission's exemptive powers. See generally Madigan amendments to Sec. 502 of H.R. 7235, 126 Cong.Rec. H8590-92 (daily ed. Sept. 9, 1980)
 
 
 [96]
 126 Cong.Rec. H8592 (daily ed. Sept. 9, 1980)
 
 
 [97]
 Id. (remarks of Congressmen Anderson, Eckhardt and Albosta)
 
 
 [98]
 See generally H.R.REP. NO. 1430, 96th Cong., 2d Sess. 124-25 (1980) (report of the Conference)
 
 
 [99]
 See Thorpe v. Housing Authority, 393 U.S. 268, 281-83, 89 S.Ct. 518, 525-526, 21 L.Ed.2d 474 (1969); Potomac Electric Power Co. v. United States, 584 F.2d 1058, 1067 (D.C.Cir.1978)
 
 
 [100]
 49 U.S.C. Sec. 10505(a) (Supp. IV 1980)
 
 
 [101]
 See Halkin v. Helms, 690 F.2d 977, 994 n. 65 (D.C.Cir.1982); see also Burlington Truck Lines v. United States, 371 U.S. 156, 171-72, 83 S.Ct. 239, 247-248, 9 L.Ed.2d 207 (1962); cf. NLRB v. Pittsburgh S.S. Co., 340 U.S. 498, 500, 71 S.Ct. 453, 454, 95 L.Ed. 479 (1951) (court's power to review agency decision governed by law existing at time of review). We add that even under the standards prevailing at the time the Commission acted, see 49 U.S.C. Sec. 10505(a) (Supp. III 1979), the Commission's findings meet the statutory test
 
 
 [102]
 Brief for Petitioner at 16
 
 
 [103]
 Id. at 18-19
 
 
 [104]
 5 U.S.C. Sec. 706(2)(A) (1976); American Trucking Ass'n v. United States, 642 F.2d 916, 920 (5th Cir.1981)
 
 
 [105]
 United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972); National Tour Brokers Ass'n v. Interstate Commerce Commission, 671 F.2d 528, 532 (D.C.Cir.1982)
 
 
 [106]
 See 671 F.2d at 532-33
 
 
 [107]
 Common Carrier Status of States, 363 I.C.C. 132, 135 (1980)
 
 
 [108]
 Id
 
 
 [109]
 Id
 
 
 [110]
 Brief for Petitioner at 18-19
 
 
 [111]
 See Common Carrier Status of States, 363 I.C.C. 132, 133, 135-36 (1980)
 
 
 [112]
 Id. at 133
 
 
 [113]
 See Rail General Exemption Authority--Fresh Fruits and Vegetables, 361 I.C.C. 374 (1979); cf. American Trucking Ass'n v. United States, 642 F.2d 916 (5th Cir.1981) (Commission determination that regulation not needed to protect shippers from market power abuse upheld)
 
 
 [114]
 49 U.S.C. Sec. 10505(a) (Supp. IV 1980)
 
 
 [115]
 Common Carrier Status of States, 363 I.C.C. 132, 136 (1980)
 
 
 [116]
 Id
 
 
 [117]
 Id
 
 
 [118]
 See Brief for Petitioner at 16-18
 
 
 [119]
 See Common Carrier Status of States, 363 I.C.C. 132, 137 (1980)
 
 
 [120]
 See Common Carrier Status of States (Modification of Rules), 46 Fed.Reg. 37,702, 37,704 (1981)
 
 
 [121]
 Brief for Petitioner at 23-24
 
 
 [122]
 Id. at 24